## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JULIE TATUM and VINCE BRACCILI,** | : | CIVIL DIVISION |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| **PROGRESSIVE SPECIALTY** | : | |
| **INSURANCE COMPANY,** | : | |
| | : | |
| *Defendant.* | : | NO. 24-2086 |

### MEMORANDUM

**KENNEY, J.**                                                                                         **June 23, 2025**

Plaintiffs Julie Tatum ("Ms. Tatum") and Vince Braccili ("Mr. Braccili") (together, "Plaintiffs") filed a nine-count Complaint against Progressive Specialty Insurance Company ("Progressive" or "Defendant") and one of its adjusters. ECF No. 1 at 171. The Court dismissed the adjuster as a defendant, ECF No. 14, and dismissed all but three counts against the Defendant: Count I (Bad Faith Pursuant to 42 Pa. C.S.A. §8371 ("Section 8371")), Count II (Breach of Contract/Good Faith and Fair Dealing), and Count IX (Loss of Consortium). ECF Nos. 18, 19, 25.

Before the Court is Defendant's Motion for Summary Judgment (ECF No. 56, "Motion") on the remaining counts along with its accompanying Brief in Support of the Motion for Summary Judgment (ECF No. 57) and Stipulated Concise Statement of Undisputed Material Facts (ECF No. 58, "SOF"). Plaintiffs filed their Response to the Motion (ECF No. 59), to which Defendant filed

its Reply (ECF No. 61), followed by a Sur-Reply by the Plaintiffs (ECF No. 62).[1] The Motion is now ripe for consideration.

For the reasons discussed below, the Motion is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

Ms. Tatum was involved in a motor vehicle accident on June 11, 2021. SOF ¶ 1. At the time of her accident, she was insured under an automobile insurance policy by Defendant (the "Policy"). *Id.* ¶ 2. The Policy provided up to $15,000 in underinsured motorist ("UIM") coverage, subject to the terms and conditions of the policy. *Id.* ¶ 3. Progressive agreed to reform the policy to provide stacked coverage up to $45,000. *Id.* ¶ 4. Ms. Tatum elected limited tort coverage. *Id.* ¶ 5. Since the other driver involved in the accident had $15,000 in liability insurance coverage, Ms. Tatum was not entitled to UIM benefits unless her damage exceeded $15,000. *Id.* ¶¶ 7–8.

### a.   Progressive Opens and Evaluates Ms. Tatum's UIM Claim

On June 21, 2021, Progressive was made aware that Ms. Tatum hired legal counsel to represent her for injuries she sustained in the accident, *id.* ¶ 9, but she did not make a formal claim for UIM benefits before suing for those benefits in April of 2022, *id.* ¶ 10. On April 21, 2022, Progressive opened a UIM claim on Ms. Tatum's behalf that was assigned to Thomas Murray ("Murray"). *Id.* ¶¶ 11–12. Murray noted that there was no dispute the policy provided $45,000 in UIM coverage such that the focus of the investigation would be damages. *Id.* ¶¶ 13–14. Since the other driver had $15,000 in coverage, Ms. Tatum's damages would have to exceed that amount to recover UIM benefits. *Id.* ¶ 15. At the time of Murray's initial review, he had been provided no

---

[1] The Sur-Reply (ECF No. 62) is not responsive to the Reply (ECF No. 61) although it is signed and dated correctly on the Certificate of Service.

[2] The SOF uses "Plaintiff" and "Plaintiffs" interchangeably. *See, e.g.*, SOF ¶¶ 16–17. The Court will refer to "Ms. Tatum" when it is clear the SOF only means her individually and "Plaintiffs" when it clearly is referring to all Plaintiffs.

documentation of Ms. Tatum's injuries. *Id.* ¶ 16. Murray noted he would obtain medical records, work with counsel to schedule a deposition, and evaluate Ms. Tatum's claim. *Id.* ¶ 17.

Plaintiffs' counsel sent a demand package to Murray on May 5, 2022, which he reviewed shortly thereafter. *Id.* ¶¶ 18–19. After conducting his initial evaluation and noting he needed more information, Murray noted Ms. Tatum had sustained a concussion for which she had been treated and discharged after making a 100% recovery. *Id.* ¶ 21. He also noted that an MRI showed a disc protrusion.[3] *Id.* ¶ 22. Murray noted that there were no references to prior concussions or back issues in Ms. Tatum's medical records. *Id.* ¶ 23.

Murray did not assign any value to the disc protrusion at the time of his initial review because "we'll need to get film reviewed to get an opinion on causation." *Id.* ¶¶ 24–25; *see also id.* ¶ 26. Murray then contacted Plaintiffs' counsel to request information regarding out-of-pocket medical expenses or lost wages as well as information regarding scars and disfigurements resulting from airbag burns. *Id.* ¶¶ 27–28. Ms. Tatum's counsel confirmed on May 18, 2022, that Ms. Tatum did not have health insurance at the time and that lost wage information would be provided. *Id.* ¶¶ 29–30. On June 15, 2022, Plaintiffs' counsel emailed Murray pictures of Ms. Tatum's air bag injuries and stated that they were still awaiting wage loss verification. *Id.* ¶ 32. Beginning July 14, 2022, Murray reached out to Plaintiffs' counsel by email and phone requesting wage loss information on four occasions until Plaintiffs' counsel finally informed Murray that the wage loss claims were being dropped on February 3, 2023. *Id.* ¶¶ 32–40.

Upon learning Ms. Tatum would not be presenting a wage loss claim, Murray evaluated her claim and performed a second UIM evaluation on March 2, 2023. *Id.* ¶¶ 41–42. Murray noted

---

[3] The SOF and exhibits regularly use "disc protrusion" and "disc herniation" interchangeably. *Compare* ECF No. 58 ¶ 22, *with id.* ¶ 74; *compare* ECF No. 58-4 at 37, *with id.* at 68; *compare* ECF No. 58-5 at 3, *with id.* at 4. The Court will use the term used in the specifically cited portion of the document.

that general damages were between $17,000 and $24,000, Ms. Tatum had out of pocket medical expenses totaling $1,027, and she underwent conservative treatments that included one trigger point injection for approximately four months. *Id.* ¶¶ 43–45. Murray noted a question regarding whether the limited tort threshold would be pierced. *Id.* ¶ 46. At that time, Murray noted that an MRI showed a disc protrusion but did not assign any value to the protrusion. *Id.* ¶¶ 47–48. Murray again noted that "we'll need to get film reviewed to get an opinion on causation." *Id.* ¶ 49.

### b. Plaintiff's Deposition and the Expert Reports

Ms. Tatum's deposition was scheduled for March 7, 2023, and Murray and his supervisor decided to wait to finalize the evaluation until after the deposition to further assess the limited tort issue. *Id.* ¶ 50. Murray attended the deposition, took detailed notes, and completed a post-deposition call with his supervisor and defense counsel. *Id.* ¶¶ 51, 53. After the deposition, Murray concluded that it did not appear that Ms. Tatum's injuries would breach the limited tort threshold. *Id.* ¶ 54.

On April 24, 2023, Ms. Tatum produced the expert report of her treating physician, Dr. Murphy, a physical therapist. [4] *Id.* ¶¶ 55–59. After Ms. Tatum's last treatment by Dr. Murphy in October of 2021, he discharged Ms. Tatum from physical therapy to a home exercise program. *Id.* ¶ 60. In his report, Dr. Murphy opined that the prognosis for the recovery of Ms. Tatum's disc protrusion was poor without surgical intervention and that she would require either ongoing physical therapy/injections into the future and/or surgical interventions if she has unremitting pain. *Id.* ¶¶ 61–62. Dr. Murphy opined that the protrusion was related to the accident. *Id.* ¶ 63. Dr. Murphy was the only doctor who asserted Ms. Tatum would need physical therapy or surgery in the future. *Id.* ¶ 64. Ms. Tatum has not received any physical therapy from Dr. Murphy since she

---

[4] Dr. Murphy's signature block includes the title "DO." *See* ECF No. 58-7 at 7.

4

was discharged in October of 2021. *Id.* ¶ 65. Murray did not interpret Dr. Murphy's October 19, 2021 office note, which states, "we discussed treatment options today again, both invasive and noninvasive," to mean potential future surgery. *Id.* ¶ 81.

In April 2023, Murray requested that Dr. Lee Harris, a neurologist, review Ms. Tatum's medical records and provide an opinion regarding the nature and extent of Ms. Tatum's injuries. *Id.* ¶ 67. On May 4, 2023, Murray noted that Dr. Harris had issued his report, and the report provided that Ms. Tatum's head injury was consistent with a concussion and that her concussion symptoms were all resolved two months after the accident. *Id.* ¶¶ 68, 73. The report also provided that the location and laterality of the L5-S1 disc herniation would correlate with Ms. Tatum's report of radicular symptoms down the left and the EMG report of acute-subacute left L5 radiculopathy. *Id.* ¶ 74. Unlike Dr. Murphy, Dr. Harris found that Ms. Tatum's disc protrusion appeared to be chronic and predated the motor vehicle accident. *Id.* ¶ 75. Dr. Harris was the only doctor who believed the herniated disc pre-dated the accident. *Id.* ¶ 80. In preparing his report, Dr. Harris did not perform any examination of Ms. Tatum, was aware that Ms. Tatum testified she did not have health insurance, and at no time was provided with her deposition. *Id.* ¶¶ 69, 77, 79.

After reviewing the expert reports, Murray revised his evaluation to a low of $1,027 and a high of $11,522, noting that the out-of-pocket expenses totaled $1,027 and that the high end of the evaluation reflected costs associated with defending a lawsuit. *Id.* ¶¶ 83, 85–86. Murray noted that "based on non-invasive treatment and deposition testimony I do not see a tort pierce." *Id.* ¶ 84. Murray's supervisor agreed with his assessment. *Id.* ¶ 87.

### c. Progressive's Offers and Subsequent Trial

On May 5, 2023, Murray called Ms. Tatum's counsel and offered $5,000 to resolve the claim, highlighting the short treatment duration, the resolution of concussion symptoms, and

treatment ending in October of 2021. *Id.* ¶¶ 89–90. Ms. Tatum's counsel disagreed and demanded the policy limits. *Id.* ¶ 91. At some point during a pre-trial call, someone made the point that any excess verdict would be molded down to reflect the $45,000 policy limits. *Id.* ¶ 93. After a May 16, 2023 pre-trial call, Murray evaluated Ms. Tatum's claim between $0 and $18,527, which included $5,000 to $10,000 for concussion-related symptoms and treatment, $5,000 to $10,000 for sprains and strains, and $5,000 for additional damages. *Id.* ¶ 94. An additional $7,500 was attributed to costs. *Id.* ¶ 95.

Later on May 16, 2023, Murray offered $10,000 to settle the claim, which Ms. Tatum rejected citing an economist's report that had not been referenced or provided to Progressive before. *Id.* ¶¶ 97–98. Murray received and noted the report on May 30, 2023; it projected future treatment costs of $458,083, which included a one-time surgery cost of $98,998 and lifetime physical therapy and injections costs of $359,085.[5] *Id.* ¶¶ 99–100. Murray noted that the report did not seem to be appropriate given the injury and treatment information available—including that Ms. Tatum had received limited, conservative treatment that ended 22 months prior. *Id.* ¶ 101. Murray then offered $12,000 on June 5, 2023, which was also rejected. *Id.* ¶ 102.

---

[5] Ms. Tatum underwent conservative treatments that included one injection and physical therapy that lasted approximately four months. SOF ¶ 45. The total cost of Ms. Tatum's out-of-pocket medical expenses was $1,027. *Id.* ¶ 44. Her physical therapy ended in October of 2021. *Id.* ¶ 60.

In May of 2023, well over a year after Ms. Tatum's discharge from physical therapy, an economist's report projected her future medical expenses to be $458,083. ECF No. 58-9 at 3. This report based its calculations on semiannual injections, physical therapy for an annual exacerbation of her injury, and a one-time lumbar spine surgery. *Id.* at 4. These projections go well beyond the $1,027 Ms. Tatum spent on her care immediately after the accident and do not reflect the care she sought and received in the almost two years after the crash.

The Court observes the increasing prevalence of such future medical expense projections. These projections show astronomical future costs for individuals who received conservative treatment for their injuries. Often, treatment for these injuries has long been complete. As with Ms. Tatum, these reports indicate a pressing need for continual and invasive care for individuals who received minimal, non-invasive medical treatment. *See* ECF No. 58-9 at 4 ("Lumbar Spine Surgery . . . (within 5 years)"). Frequently, nothing in the record indicates that these parties need or would even undergo the near-constant and extreme medical care projected in these reports, especially since they have not received the care to date.

6

The UIM case proceeded to trial on August 17, 2023, and the jury rendered a verdict for Plaintiff. *Id.* ¶ 103. The loss of consortium and wage loss claims were dropped before trial and Plaintiff did not present a claim for past medical expenses. *Id.* ¶¶ 106–11. The jury found that Plaintiff did not pierce the limited tort threshold and did not award Plaintiff any non-economic damages. *Id.* ¶¶ 104–06. The jury awarded $125,000 to Plaintiff for future medical expenses only. *Id.* ¶ 112. The jury award was molded to the policy limits of $45,000 along with delay damages. ECF No. 58-4 at 85.

Plaintiffs filed a nine-count Complaint against Progressive and Murray in the Delaware County Court of Common Pleas. ECF No. 1 at 171; ECF No. 58-1. Defendants Progressive and Murray removed the action to federal court. ECF No. 1. The Court dismissed Murray as a defendant, ECF No. 14, and dismissed all but three counts against the Defendant: Count I (Bad Faith Pursuant to 42 Pa. C.S.A. §8371), Count II (Breach of Contract/Good Faith and Fair Dealing), and Count IX (Loss of Consortium), ECF Nos. 18, 19, 25. After the close of discovery, Defendant moved for summary judgment on the remaining claims (ECF No. 56) along with its accompanying brief (ECF No. 57) and SOF (ECF No. 58). Plaintiffs filed their Response to the Motion (ECF No. 59), to which Defendant filed its Reply (ECF No. 61), followed by a Sur-Reply by the Plaintiffs (ECF No. 62).

## II.    LEGAL STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Therefore, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law.'" *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production, *Anderson*, 477 U.S. at 252, and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *see Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), or arguments made in briefs, as those "are not evidence," *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

When determining the existence of a genuine issue of material fact, a court must "examine the evidence of record in the light most favorable to the party opposing summary judgment[] and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

## III.    DISCUSSION

Defendant moves for summary judgment on Plaintiffs' remaining claims: Count I (Bad Faith Pursuant to Section 8371), Count II (Breach of Contract/Good Faith and Fair Dealing), and Count IX (Loss of Consortium). The Court grants the Motion on each claim, as discussed below.

### a.    Count I (Bad Faith Pursuant to Section 8371)

Defendant moves for summary judgment on Ms. Tatum's bad faith claim under Section 8371. ECF No. 57 at 7–21. Defendant asserts that it did not complete its UIM claim review in bad faith since there was a genuine dispute over the value of Ms. Tatum's UIM claim, *id.* at 9–17, that any delay in resolving the claim resulted from Progressive's need to investigate and evaluate the claim as well as from Plaintiff's own delay, *id.* at 17–20, and that it properly relied on its own expert report, *id.* at 20–21. Plaintiff counters that there are genuine disputes of material fact as to Progressive's handling of the claim. ECF No. 59-1 at 15–25. The Court holds that Defendant is entitled to summary judgment as a matter of law since Plaintiffs have not produced evidence of bad faith in light of the substantive evidentiary burden at trial.

In order to prevail on a Section 8371 claim, a plaintiff must establish "(1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis" when it denied coverage. *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 365 (Pa. 2017) (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994)). The statute does not define "bad faith," but the Pennsylvania Supreme Court has defined bad faith to be "any frivolous or unfounded refusal to

9

pay proceeds of a policy[.]" *Rancosky*, 170 A.3d at 373 (quoting *Terletsky*, 649 A.2d at 688). At trial, the insured must prove the elements of the claim under Section 8371 by clear and convincing evidence. *Terletsky*, 649 A.2d at 688; *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. Ct. 1999); *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa. Super. Ct. 1997). Under Pennsylvania law, "[t]he standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203–04 (Pa. 1989) (citing *La Rocca Tr.*, 192 A.2d 409, 413 (Pa. 1963), and *In re Justin S.*, 543 A.2d 1192 (Pa. Super. Ct. 1988)). At the summary judgment stage, the plaintiff's burden in opposing the motion is "commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." *Nw. Mut. Life. Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005).

Plaintiffs' Complaint alleges that that Progressive lacked a reasonable basis for an extensive list of its actions and acted recklessly and in conscious disregard of the facts, law and obligations at issue. *See* ECF No. 58-1 ¶ 105 (listing allegations "a" through "www"). These allegations include that Murray's investigation into the claim was lacking, *see, e.g.*, *id.* ¶ 105 a, d, e, g, p, r, v, xx, ww, ggg, hhh; that the investigation was delayed unnecessarily, *see, e.g.*, *id.* ¶ 105 ee, ww, ddd, ooo; that Progressive inappropriately used, influenced, and relied on its expert, *see, e.g.*, *id.* ¶ 105 h, i, j, k, l, m, n, o, q, xx, kkk, rrr, sss, vvv; that Progressive engaged in litigation practices in bad faith, *see, e.g.*, *id.* ¶ 105 b, s, x, jj, qqq, vvv, www; that Progressive did not engage in good-faith settlement attempts, *see, e.g.*, *id.* ¶ 105 t, u, x, ll, vv, nnn; among other allegations. Plaintiffs argue in their Response that there are disputes of material fact regarding Progressive's "decision to question the cause of Mrs. Tatum's disc herniation," ECF No. 59-1 at 16, "failure to

timely engage medical professionals and conduct an IME," *id.* at 19, and "failure to provide its medical expert with all of the medical records and deposition testimony," *id.* at 23.

The Court views the evidence in the light most favorable to the Plaintiffs as non-movants while also considering it in light of the substantive evidentiary burden at trial. Despite the extensive allegations and arguments, after the close of discovery, the record does not show evidence of bad faith that would allow a trier of fact to find in Plaintiffs' favor. Rather, "[t]he underlying facts involve nothing more than a normal dispute between an insured and insurer." *Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 785 (Pa. Super. Ct. 2009). Bad faith "is not present merely because an insurer makes a low but reasonable estimate of an insured's damages." *Id.* at 784.

The record shows Murray promptly began processing the claim once the formal UIM claim was made, SOF ¶ 10, was forced to delay processing because Plaintiffs did not provide him pertinent information which he sought at regular intervals, *id.* ¶¶ 32–40, relied on an appropriately obtained expert report, *id.* ¶¶ 67–81, 83, and made settlement offers based on that reasonable position, *id.* ¶¶ 89, 94, 96, 102. None of Plaintiffs' arguments in their Response show a dispute of material fact in the record, as discussed below in turn.

### i. The record does not show Progressive acted in bad faith by questioning the cause of the disc protrusion

Plaintiffs argue that Progressive acted in bad faith by questioning the cause of the disc protrusion. The record, however, does not show that Progressive's decision to question the cause of Ms. Tatum's disc protrusion was made in bad faith. When Murray conducted his UIM review, Dr. Murphy had discharged Ms. Tatum from physical therapy half a year prior to a home exercise program. *Id.* ¶ 60. Ms. Tatum had not received medical treatment in the time between her discharge

and Murray's initial review. *Id.* ¶ 76. From the outset of his review, Murray indicated that there were questions on causation. *Id.* ¶ 25.

Causation was disputed by the experts who reviewed Ms. Tatum's file. Plaintiffs' expert, Dr. Murphy, opined that the injury was due to the accident. *Id.* ¶ 63. Dr. Murphy opined that the prognosis for the recovery of Ms. Tatum's disc protrusion was poor without surgical intervention and that she would require either ongoing physical therapy/injections into the future and/or surgical interventions if she had unremitting pain. *Id.* ¶¶ 61–62. By contrast, when Progressive's neurologist, Dr. Harris, reviewed the film and file, he opined that the protrusion was chronic and pre-dated the accident. *See id.* ¶¶ 68–73. By May of 2023, a year and a half after she was discharged by Dr. Murphy, Ms. Tatum had not received any further treatment and her out of pocket medical expenses totaled only $1,027. *Id.* ¶¶ 65, 85.

Plaintiffs cite to district court caselaw in support of their argument that questioning the cause of the disc herniation was itself bad faith. *See* ECF No. 59-1 at 16–19. Each of the cases cited is factually distinct from the case at bar. *Barry v. Ohio Casualty Group* involved injuries that were not medically examined until nearly two years after the accident. No. CIV.A.3:04 188, 2007 WL 128878, at *2–3 (W.D. Pa. Jan. 12, 2007). When the IME was finally conducted and reviewed, the counsel for the defendant found the results "'so damaging' that the case was 'worth over the policy limit." *Id.* at *3. Here, Progressive's expert report found a different cause for the injury and highlighted how little further care had been received.

*Wisinski v. American Commerce Group, Inc.* is also distinct. No. CIV. 07-346 ERIE, 2011 WL 13744 (W.D. Pa. Jan. 4, 2011). In *Wisinki*, the insurance company continually made very low offers after receiving a medical report from the plaintiff, who had already incurred medical bills of more than $50,000. *Id.* at *16. The "only actual medical documentation . . . possessed when

12

[defendant] made the first two extremely low settlement offers" showed that the injuries to the defendant were caused or accelerated by the accident. *Id.* at *17. Here, Defendant made its offers based on the file and its expert review of the medical record.

Plaintiffs also reference *Bonenberger v. Nationwide Mutual Insurance*, 791 A.2d 378 (Pa. Super. Ct. 2002), in passing. It similarly is factually distinct. The insurer requested but never completed an independent medical examination and then made low-ball offers without any medical basis. *Id.* at 379.[6]

Unlike the district court cases cited by Plaintiffs, the record here does not show that Progressive acted in bad faith. The record does not show it was bad faith for Progressive to have its own expert review the cause of Ms. Tatum's disc protrusion. Here, Progressive decided to have a neurologist review the film in the context of Ms. Tatum not receiving medical treatment after a year and a half. SOF ¶ 65. The medical treatment she did undergo was conservative. *Id.* Once Dr. Harris reviewed the film and medical records, he concluded the disc herniation was chronic in nature and predated the accident. ECF No. 58-5 at 4. The film was "consistent with disc degeneration." *Id.* Review of the film by a neurologist revealed a different conclusion than that presented by Ms. Tatum's physician. Independent review of the film and medical file by Progressive in light of the specific facts in the record does not show bad faith on its part.

---

[6] Plaintiffs also argue that Progressive paying Ms. Tatum's medical bills but questioning causation in the UIM claim shows it acted in bad faith. ECF No. 59-1 at 18–19. The caselaw provided by Plaintiffs refutes this argument. *Barry*, cited by Plaintiffs, includes a citation to *Pantelis v. Erie Insurance Exchange*, 890 A.2d 1063 (Pa. Super. Ct. 2006) that states "the Pennsylvania Superior Court explained that the 'payment of first party benefits does not preclude an insurer from later denying third party UM/UIM benefits.' *Pantelis*, 890 A.2d at 1067–68. '[A] payment of first party benefits does not, in and of itself, constitute an admission of causation and a concomitant obligation to pay UM/UIM benefits.' *Id.* at 1068 n. 4." 2007 WL 128878, at *10.

ii. **The record does not show Progressive acted in bad faith by waiting until April 2023 to request Dr. Harris's review of the medical record and by not conducting an IME**

Plaintiffs argue that there is a dispute of material fact on whether Progressive acted in bad faith by waiting until April of 2023 to engage a medical professional to review the file. ECF No. 59-1 at 19–23. Plaintiffs also argue that Progressive acted in bad faith when it had Dr. Harris conduct only a review rather than an IME. *Id.* The record does not show that the delay involved in obtaining a review of the medical report and choosing to conduct only a review was bad faith.

Plaintiffs highlight that Progressive did not have its neurologist complete his report until almost a year after Murray began his review. *Id.* at 21. This argument ignores that lost wage information, an area of potentially meaningful payout to Ms. Tatum, was not provided by the Plaintiffs' counsel. SOF ¶ 27. Murray regularly asked Plaintiffs' counsel for lost wage information to complete the evaluation, frequently receiving no or heavily delayed responses. *See id.* ¶¶ 27, 32, 34–39. It was not until February 3, 2023, that Plaintiffs' counsel told Murray the wage loss claims were being dropped. *Id.* ¶¶ 32–40. Murray then conducted a second UIM evaluation. *Id.* ¶ 42. Plaintiffs provided their expert report on April 24, 2023, *id.* ¶¶ 55–59, and Murray noted Dr. Harris had issued his report on May 4, 2023, *id.* ¶ 68.[7] Defendant states this was consistent with case management deadlines for the expert reports set in the lawsuit Plaintiffs filed. ECF No. 61 at 8.

Plaintiffs' attribution of the delay solely to Defendant, when their counsel delayed heavily in providing necessary information to complete the review, is not evidence of bad faith on the part of Defendant. The record shows Murray followed up with Plaintiffs' counsel regularly. Once Murray was told Plaintiffs would not be submitting wage loss information, he promptly conducted

_____

[7] The medical records attached as exhibits to ECF No. 58 include Dr. Harris's report for the Defendant dated April 20, 2023, ECF No. 58-5, as well as Dr. Murphy's report for the Plaintiffs dated April 24, 2023, ECF No. 58-7. Plaintiffs' report explicitly references reviewing Defendant's report. *Id.* at 6.

a second evaluation, SOF ¶ 42, attended Ms. Tatum's deposition personally which was scheduled shortly thereafter, *id.* ¶¶ 50–51, and obtained Dr. Harris's review of the record and film, *id.* ¶¶ 55, 67. The record does not show bad faith in the timing of Dr. Harris's review.

There is also no evidence that a review of Ms. Tatum's medical file rather than a full examination was conducted in bad faith. Ms. Tatum had a simple injury that was well documented. When Murray conducted his UIM review, Ms. Tatum had been discharged from physical therapy for half a year. *Id.* ¶ 60. Ms. Tatum had not received medical treatment in the time between her discharge and Murray's initial review. *Id.* ¶ 76. When Dr. Harris conducted his review, she had not received any further treatment and her out of pocket medical expenses of her conservative treatment totaled only $1,027. *Id.* ¶¶ 65, 85.

The caselaw Plaintiffs cite to support the argument that Progressive did not engage medical professionals in a timely manner and failed to conduct an IME is not binding and factually distinct. In *Baum v. Metropolitan Property and Casualty Insurance Company*, the defendant's adjuster did not request an independent medical review or independent medical examination in a UIM claim where the plaintiff had a rare, complex, and unique preexisting condition. No. 2:16-CV-623, 2019 WL 4689024, at *3, *5 (W.D. Pa. Sept. 26, 2019). After years of evaluating the claim and negotiations falling apart, the plaintiff finally sued the defendant insurance company. *Id.* at *3. The defendant only conducted an IME in anticipation of the litigation two years after being provided the plaintiff's complete medical file. *Id.* Here, by contrast, Plaintiffs filed their suit and UIM claim simultaneously, there were no unique medical factors at issue, and Defendant engaged a medical professional promptly after the wage loss claim information was received.

Plaintiffs also cites to *Mineo v. Geico*, No. 12-1547, 2014 WL 3450820 (W.D. Pa. July 15, 2014), *Hollock v. Erie Ins. Exch.*, 54 Pa. D. & C.4th 449 (Pa. Ct. Com. Pl. 2002), and *Bonenberger*

*v. Nationwide Mut. Ins. Co*., 791 A.2d 378 (Pa. Super. Ct. 2002) which all factually differ. In *Mineo*, the insurer's file of the claim was woefully inadequate and an IME was only obtained in anticipation of litigation two years after the insured retained counsel. 2014 WL 3450820, at *6–7. *Hollock* involved a claim where the record was "replete with numerous instances where . . . the guidelines were either ignored or disregarded" in a UIM claim where virtually no investigation was conducted since the adjuster "saw no point" in doing so. Pa. D. & C.4th at 454, 514. In *Bonenberger,* the insurer requested an IME but never scheduled it, and proceeded to make low settlement offers. 791 A.2d at 379–80. Here, the record shows that Murray was careful in his review of the UIM claim and that he obtained independent review of the medical records shortly after all relevant information for the claim was received.

Accordingly, the record does not show Progressive acted in bad faith by waiting until April of 2023 to obtain medical review of the file or by only obtaining review of the file rather than an IME.

### iii.  The record does not show Progressive acted in bad faith in its disclosures to Dr. Harris

Lastly, Plaintiffs argue there is a dispute of material fact because Progressive did not provide its expert with all medical records or Ms. Tatum's deposition testimony. ECF No. 59-1 at 23. The record does not show Dr. Harris was provided with insufficient records or that he needed Ms. Tatum's deposition for his review.

Murray requested Dr. Harris "review [Ms. Tatum's] medical records and provide an opinion regarding the nature and extent of [her] injuries." SOF ¶ 67. Dr. Harris's report, attached as Exhibit E to the SOF, states that he "had the opportunity to review medical records and radiographs on CD of Julie Tatum." ECF No. 58-5 at 2. Dr. Harris's report goes on to describe a

recorded interview of Ms. Tatum, an urgent care visit, physical medicine report by Dr. Murphy, physical and occupational therapy evaluations and treatment notes, further notes from Dr. Murphy, and an MRI. *Id.* at 3–4.

Plaintiffs do not point the Court to the pre-accident medical records that Dr. Harris should have reviewed to draft his report. Rather, Plaintiffs argue that "Dr. Harris was never provided with, or ignored, Mrs. Tatum's pre-accident medical records to determine whether she had any pre-existing injuries. *See* Ex. E. to Def. SOF." Plaintiffs' own medical report, however, does not show that Ms. Tatum's doctor was given pre-accident medical records to review, just that he reviewed her past medical history during initial treatment. *See* ECF No. 58-7 at 1, 5. Dr. Murphy's medical report only lists the following under "Records Reviewed": "Records from AFC Urgent Care," "Records from Bryn Mawr Rehabilitation," and "MRI report of the lumbar spine from Open MRI from 08/26/2021. I also personally reviewed the DVD images from that study." ECF No. 58-7 at 5. Dr. Murphy also reviewed non-medical records that included the deposition transcript. *Id.* Plaintiffs have not shown Progressive acted in bad faith where they do not point to the specific medical records that should have been reviewed and their own expert relied on the same records.

Plaintiffs also argue that Dr. Harris should have conducted an IME where he would have had a face-to-face meeting with Ms. Tatum and obtained her past medical history. ECF No. 59-1 at 23. Plaintiffs do not direct the Court to the relevant part of the record to support their argument that Defendant's expert should have conducted an IME. Plaintiffs cite to Murray's deposition and the importance of Ms. Tatum's deposition to Murray's own review. *Id.* (citing ECF No. 58-2 121:16-21).[8] Plaintiffs only cite to *Hollock*, discussed above, in support of this argument. The facts

---

[8] The cited portion of Murray's deposition is as follows: ""Q: I just am – all I'm asking you is was her testimony important enough whether it changed your [Murray's] evaluation. A: Well, it definitely, it was important. And like I said, those were the factors I considered after her deposition. That was my evaluation."

of *Hollock* make it inapplicable here. As discussed above, a review of Ms. Tatum's medical file rather than an IME does not show bad faith.

After making their primary arguments that Progressive's expert should have been provided with more information and conducted his own IME, Plaintiffs then launch into a rapid-fire list of arguments to support that Progressive relied on Dr. Harris's report in bad faith.[9] ECF No. 59-1 at 24. As discussed above, Dr. Harris provided the medical basis for his report. Plaintiffs' recapitulation of most of their arguments in rapid succession does not create a genuine dispute of material fact.

Accordingly, the record does not show that Progressive acted in bad faith when it had Dr. Harris review the medical records and did not provide him with Ms. Tatum's deposition testimony.

\*   \*   \*

The record does not show that Progressive acted in bad faith. None of Plaintiffs' arguments in their Response show a dispute of material fact in the record. The Court grants Defendant's motion for summary judgment as to Count I (Bad Faith Pursuant to Section 8371).

### b.  Count II (Breach of Contract/Good Faith and Fair Dealing)

Defendant moves for summary judgment on Plaintiff Julie Tatum's claim for a breach of the implied covenant of good faith and fair dealing, on the grounds that it is not recognized under Pennsylvania law. ECF No. 57 at 4. Ms. Tatum argues that insurance contracts in Pennsylvania

---

[9] These arguments include: Dr. Harris rendered an opinion on causation without having reviewed Ms. Tatum's pre-accident medical records, Progressive deliberately did not provide Ms. Tatum's deposition testimony to Dr. Harris or he ignored it, Dr. Harris did not perform an IME or have any face-to-face interview with Ms. Tatum, Dr. Harris's report is unsubstantiated by Ms. Tatum's prior medical records, Dr. Harris actually concluded the disc herniation was acute, Dr. Harris ignored the principle that a defendant takes a plaintiff as it finds her, and Progressive paid Ms. Tatum's medical bills for the same injuries disputed in the UIM claim. *Id.*

have an implied covenant of good faith and fair dealing that was violated by Progressive in this case. ECF 59-1 at 7.

Pennsylvania law recognizes a common law cause of action for breach of an implied covenant of good faith and fair dealing in **third-party** insurance—a contract to protect the insured from actual or potential monetary liability. *Cowden v. Aetna Cas. & Sur. Co.*, 134 A.2d 223, 228 (Pa. 1957); Couch on Insurance § 198:3 (3d ed. 2023). In *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Company*, the Pennsylvania Supreme Court rejected the opportunity to extend this common law cause of action to **first-party** insurance—a contract protecting the insured's own losses and expenses. 431 A.2d 966, 971–72 (Pa. 1981); Couch on Insurance § 198:3 (3d ed. 2023).

In 1990, the Pennsylvania Legislature created a statutory cause of action for bad faith in Section 8371 that is understood as the legislative reaction to *D'Ambrosio. See, e.g.*, *Rancosky v. Wash. Nat'l Ins. Co.*, 170 A.3d 364, 371 (Pa. 2017) ("[W]e observe that Section 8371 is widely considered a delayed legislative response to this Court's 1981 decision in [*D'Ambrosio*] in which we declined to recognize the common law right of action that had been adopted by a number of courts throughout the United States at that time related to an insurer's failure to act in good faith when refusing to cover a loss under an insured's policy."). The cause of action under Section 8371 is statutory, however, and *D'Ambrosio* is still controlling law for *common law* first-party bad faith claims. *See, e.g.*, *Rancowsky*, 170 A.3d at 371–72 (summarizing changes in national bad faith jurisprudence and the history of the Pennsylvania Supreme Court rejecting the creation of a common law bad faith cause of action in the first-party context); *Toy v. Metro. Life Ins. Co.,* 928 A.2d 186, 198–99 (Pa. 2007) (same); *Terletsky*, 649 A.2d at 688 ("We recognize that there is no

common law remedy in Pennsylvania for bad faith on the part of insurers. However, the Pennsylvania Legislature has created a statutory remedy . . . ." (citations omitted)).

A UIM claim is a "hybrid claim[] that involve[s] elements of both first party claims and third party claims." *Condio v. Erie Ins. Exch.* 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006). Like a first party claim, insureds make a UIM claim against their own insurance under their own policy. *Id.* at 1144. The UIM claims process then becomes "very much like third party claims" that are inherently adversarial. *Id.* Pennsylvania Superior Court decisions have held that "an individual making a UIM claim is making a first party claim" such that Section 8371 extends to the handling of UIM claims. *See, e.g.*, *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 500 (Pa. Super. Ct. 2004); *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 (Pa. Super. Ct. 2002).

Plaintiff cites to federal district court caselaw in Pennsylvania for the proposition that the distinction between first and third party claims does not matter to the implied covenant of good faith and fair dealing when the bad faith claim arises out of contract rather than tort law. *See* ECF No. 59-1 at 7–8 (citing *Porter v. Safeco Ins. Co. of Ill.*, No. 3:15-CV-759, 2016 WL 556706, at *5 (M.D. Pa. Feb. 9, 2016), and *Zaloga v. Provident Life & Accident Ins. Co. of Am.*, 671 F. Supp. 2d 623, 629 (M.D. Pa. 2009)). This Court declines to follow these non-binding decisions, given that the Pennsylvania Legislature has created a statutory cause of action applicable to UIM claims and the Pennsylvania Supreme Court has made clear there is no common law claim for bad faith in a

first-party claim.[10] Accordingly, Ms. Tatum's claim for common law breach of contract/good faith and fair dealing fails as a matter of law and the Motion is granted.[11]

### c. Count IX (Loss of Consortium)

Plaintiff moves for summary judgment on Mr. Braccili's loss of consortium claim. "Loss of consortium is an injury referring to 'the impact of one spouse's physical injuries upon the other spouse's marital privileges and amenities,' and, while remaining 'a . . . distinct cause of action' for 'loss of services, society, and conjugal affection of one's spouse,' is a claim 'derivative' of a spouse's separate claim of injury." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 777–78 (3d Cir. 2018) (alteration in original) (quoting *Darr Constr. Co. v. Workmen's Comp. Appeal Bd.*, 715 A.2d 1075, 1079–80 (Pa. 1998)).

It is unclear from the Complaint if Mr. Braccili is pursuing a loss of consortium claim based on an underlying tort claim, breach of contract claim, or some hybrid. *See* ECF No. 58-1 ¶ 196. Regardless of the theory, his claim cannot survive summary judgment since his loss of consortium claim is derivative of his wife's injuries and all her claims have been dismissed. "Under Pennsylvania law, loss of consortium, as a derivative claim, can be recovered by a [spouse] only when the defendant is liable to [the injured spouse]." *Meyers v. Protective Ins. Co.*, No. 3:16-CV-

---

[10]    Defendant implies that this Court joined other district courts in Pennsylvania in extending a contractual claim for compensatory damages based on a breach of the duty of good faith and fair dealing to a first-party claim. *See* ECF No. 57 at 4–5. The Court's ruling on Count II in Plaintiff's Motion to Dismiss (ECF No. 12) was solely on the issue of mootness. *See* ECF No. 18 at 3–5.

In its Motion to Dismiss, Defendant argued that "a breach of contract claim based upon a failure to pay insurance proceeds was moot where the insurer offered the policy limit after the District Court proceedings but before the appellate ruling." ECF No. 12-1 at 4. Defendant argued the claim was moot since Progressive paid the available policy limit. *Id.* at 5. Defendant only relied on *D'Ambrosio* when it argued that there is no common law tort claim against an insurer as to Count VIII of the Complaint. *Id.* at 12–13.

The Court's ruling on the Motion to Dismiss as to Count II rejected Defendant's assertion that there could be no breach of contractual good faith and fair dealing when insurance policy limits were paid in full. ECF No. 18 at 3– 5. It dealt only with the mootness argument presented by the Defendant, not the first- and third-party distinction in common law bad faith claims.

[11]Even if Pennsylvania recognized a common law claim, Plaintiff has not shown that Progressive acted in bad faith, *see supra* Section III.a.

01821, 2017 WL 386644, at *9 (M.D. Pa. Jan. 27, 2017) (citing *Murray v. Commercial Union Ins. Co.*, 782 F.2d 432, 437–38 (3d Cir. 1986); *Hooten v. Pennsylvania College of Optometry*, 601 F.Supp. 1151, 1155 (E.D. Pa. 1984); *Little v. Jarvis*, 280 A.2d 617, 620 (Pa. Super. Ct. 1971)). Since all of Ms. Tatum's claims have been dismissed, her husband's loss of consortium fails. [12]

## IV.    CONCLUSION

Defendant's Motion is granted as to Count I and Count II because the record does not show that Defendant acted in bad faith and Pennsylvania does not recognize a first-party common law cause of action for bad faith. Since Ms. Tatum's claims fail, Defendant's Motion is granted as to Count IX, Mr. Braccili's dependent loss of consortium claim.

BY THE COURT:

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**

---

[12] Defendant argues that loss of consortium is not recognized in contractual breaches, ECF No. 57 at 21, and Plaintiff does not provide any argument in support of its loss of consortium claim, *see* ECF No. 59. The Court's survey of caselaw finds other district courts that hold a contractual loss of consortium claim is only viable where the spouse asserting the loss of consortium is party to the contract. *See Perloff v. Transamerica Life Ins. Co.*, 393 F. Supp. 3d 404, 412 (E.D. Pa. 2019). Here, Mr. Braccili is a party to the contract. *See* ECF No. 58-3 at 2. Even if the loss of consortium claim is a contractual claim, it too fails since Ms. Tatum's contractual claim fails.